## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

GEORGE DEWBERRY,

|  |  |  |  |
|---|---|---|---|
| | Petitioner, | : | Case No. 3:21-cv-158 |
| - vs - | | | District Judge Walter H. Rice |
| | | | Magistrate Judge Michael R. Merz |

WARDEN, Lebanon
  Correctional Institution,

                                              :

        Respondent.

## REPORT AND RECOMMENDATIONS

This habeas corpus case, brought by Petitioner George Dewberry with the assistance of counsel, is before the Court for decision on the merits. Relevant pleadings are the Petition (ECF No. 1), the State Court Record (ECF No. 8), the Return of Writ (ECF No. 9), and Petitioner's Traverse (ECF No. 13).

**Litigation History**

Shortly before midnight on August 20, 2015, Jesse Pierce and his girlfriend, Laura Castro, were shot multiple times while seated in Castro's vehicle. Pierce died of his wounds, but Castro survived. *State v. Dewberry*, 2020-Ohio-691 ¶ 2 (Ohio App. 2d Dist. Feb. 28, 2020)(Froelich, J.)("*Dewberry I*"). On October 1, 2015, the Montgomery County grand jury indicted Dewberry for aggravated murder in

1

violation of Ohio Revised Code § 2903.01(A) (count 1), murder in violation of Ohio Rev. Code § 2903.02(A) (count 2), two counts of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(2) and (A)(1) (counts 3 & 4), attempted murder in violation of Ohio Rev. Code. § 2923.02(A) (count 5), and having weapons under disability in violation of Ohio Rev. Code. § 2923.13(A)(3) (count 6). All counts except for the weapons charge carried a three-year firearm specification. (Indictment, State Court Record, ECF No. 8, Exhibit 1).

After the trial judge overruled Dewberry's pretrial motions to suppress, a jury convicted him on all counts and specifications. After merger of some counts under Ohio Revised Code § 2941.25, the Judge Gorman sentenced Dewberry to an aggregated term of life without parole plus twenty years.

Dewberry appealed to the Ohio Second District Court of Appeals. After rejecting an *Anders* brief from original appellate counsel, that court appointed substitute counsel who raised the following assignments of error:

> 1. The trial court erred in overruling Dewberry's motion to suppress the pretrial identification and not allowing Dewberry to call and question Castro at the hearing.
>
> 2. Dewberry's convictions were not supported by sufficient evidence and/or were against the manifest weight of the evidence.
>
> 3. The trial court erred in not allowing defense counsel to introduce text messages sent to/from Castro's ex-boyfriend.
>
> 4. In the alternative, if the trial court did not error [sic] in disallowing defense counsel to introduce the text messages, Dewberry's counsel provided ineffective assistance at trial.
>
> 5. The trial court erred in allowing Detective Daugherty to testify about John Smith's conversation about Castro's fear and request for protection as well as his work status.
>
> 6. The trial court erred in allowing the State, on redirect, to elicit testimony from Special Agent Horan that Dewberry's phone was not at his residence when the shootings occurred.

2

>7. Dewberry was denied a fair trial as the result of the cumulative effects of multiple errors committed during his trial.

(Appellant's Brief, State Court Record, ECF No. 8, Exhibit 18, Page ID 199). The Second District affirmed the conviction. *Dewberry I.* Petitioner appealed to the Supreme Court of Ohio, pleading only one proposition of law "A Defendant's right to due process is violated when he is prohibited from calling relevant witnesses at a motion to suppress." The Ohio Supreme Court declined to exercise appellate jurisdiction. *State v. Dewberry,* 159 Ohio St. 3d 1458 (2020)("*Dewberry II*").

Dewberry filed his Petition for Writ of Habeas Corpus in this Court on June 9, 2021, pleading the following two grounds for relief:

>**Ground One**: Due Process is violated when an individual's right to compulsory process is hindered.

>**Supporting Facts:** In the instant case, the reliability of the identification and its administration procedures were examined at a motion to suppress hearing.

>Ms. Castro was the witness that eventually identified Mr. Dewberry in the second photo array that she was shown. Mr. Dewberry intended to call Ms. Castro for the purposes of eliciting testimony regarding the identification. However, the trial court did not allow Mr. Dewberry to call Ms. Castro as a witness at the motion to suppress hearing.

>Testimony regarding the procedure and surrounding circumstances regarding the administration of the photo array is an essential element in Mr. Dewberry's case. The identification from the photo array implicated Mr. Dewberry and any evidence to the contrary that reveals the procedures were impermissibly suggestive and unreliable are paramount to his defense.

>Officer Watts administered the photo array and was afforded the opportunity to testify at the motion to suppress hearing. In addition to the officer that administered the array, Ms. Castro is the best witness to state what happened.

3

If Ms. Castro were permitted to testify at the motion to suppress hearing, statements indicating that the photo array was impermissibly suggestive would have been made. For instance, she was shown the same photo array as before, but in a different order. Ms. Castro also looked at a picture of Mr. Dewberry on Facebook before the second photo array.

**Ground Two**: Due Process is violated when an unnecessarily suggestive identification procedure is utilized.

**Supporting Facts:** In this case, Ms. Castro did not identify her shooter at the hospital on the morning of the incident.

On August 25, 2015, Ms. Castro did not identify her shooter when showed a photo array that contained Mr. Dewberry's picture.

As such, Ms. Castro's failure to identify her shooter during her first two interactions with law enforcement calls into question the level of certainty and validity of any subsequent meetings or potential identifications.

Ms. Castro lost consciousness once she was shot. Eventually, she regained consciousness, but only saw a gun shoot Mr. Pierce, not the gunman.

As such, Ms. Castro's lack of consciousness substantially diminished her opportunity to view the gunman at the time of the shooting. Further, even when Ms. Castro was able to regain consciousness, it was not for a significant period of time. Ms. Castro's attention was not focused during this time, especially when accounting for any fear she experienced.

On September 21, 2015, Ms. Castro contacted the police and stated that she actually knew who the shooter was. Ms. Castro met with law enforcement on September 25, 2015.

When Ms. Castro met with police, she had a Facebook picture of Mr. Dewberry and claimed he was the individual that shot her. Ms. Castro stated that she obtained this picture from a friend request sent to her cousin.

On the same day that Ms. Castro brought in the Facebook picture, she was shown another photo array. This array contained the same individuals as the previous one, but in a different order.

4

Ms. Castro identified Mr. Dewberry at this point and signed the confidential [sic] statement form, however, she did not sign the page with the photo array. Officer Watts went back in the room and got Ms. Castro's signature a couple minutes later.

As such, almost a month prior to this she did not identify anyone when shown the photo array that contained all the same photos as the second, including Mr. Dewberry's. But, almost a month later she has a picture of Mr. Dewberry on Facebook and suddenly she is certain it was him. The Facebook photo of Mr. Dewberry necessarily tainted any subsequent photo array identification.

(Petition, ECF No. 1-2, Page ID 23-28).

# Analysis

### Ground One: Denial of Compulsory Process

In his First Ground for Relief, Petitioner claims he was denied his right to compulsory process to compel attendance and testimony from Ms. Castro at the motion to suppress hearing in violation of his Sixth and Fourteenth Amendment rights.

Dewberry raised this claim as part of his First Assignment of Error on direct appeal and the Second District Court of Appeals decided it as follows:

[*P3] On the morning of the shooting, Detective William Geiger went to the hospital and met with Castro, who could communicate in writing. Castro did not identify her shooter at that time. By August 25, the police had identified Dewberry as a suspect. Castro then was shown a photographic lineup containing Dewberry's photo, but she did not identify anyone as the shooter. After Castro was released from the hospital, she left the Dayton area and decided to contact the police about the shooting. In September 2015, Castro met with

5

Detective Brad Daugherty and showed him a photograph from
Facebook of the person who shot her; the photo was of Dewberry.
Subsequently, on September 25, Castro was shown another
photographic lineup, which contained the same individuals as the
prior lineup but in a different order. Castro identified Dewberry as
the shooter and indicated that she was 100 percent positive of her
identification.

[*P4] The police spoke with Dewberry prior to Castro's
identification. On September 8, Detective Daugherty and Detective
Tom Cope went to Dewberry's residence and spoke with Dewberry
on his back patio. The conversation was recorded. On September 22,
after Castro identified Dewberry as the shooter based on the
Facebook photo, Daugherty obtained and executed a search warrant
for Dewberry's residence. [footnote omitted] Just prior to executing
the search warrant, the police arrested Dewberry outside his home.
Dewberry requested an attorney at the police station, so no interview
occurred. However, as he was being taken to the jail, Dewberry
repeatedly asked what Castro was saying, and he made a comment to
the officers that "you'll never get her [Castro] on the stand to testify
against me." Dewberry also made another comment as he passed by
television cameras.

***

 [*P6]  Dewberry subsequently moved to suppress statements he
made and any evidence obtained as a result of the search of his
residence and of his warrantless arrest. He separately filed a motion
to suppress the photospread identification by Castro. The court held
a hearing on the statements and the search warrant issues on March
18, 2016, and a separate hearing on the photospread identification
on March 29, 2016.

 [*P7]  At the beginning of the first hearing on March 18, the court
addressed whether Dewberry would be able to call the witness who
made an identification (Castro); the court stated, "unless I determine
a certain way, the complaining witness will not be required to come
here for the motion to suppress." At the end of the first hearing, the
court stated that the hearing on the identification would occur on
March 29 and that "if, in fact, based upon the law in Ohio, I felt that
the witness who identified the defendant in the photospread needed
to be brought in, that would be after that. That would clearly
continue the hearing. But I could probably make that decision on
that date * * *." (Tr. at 44-45.) On March 29, the court heard from
four police officers regarding the photospread identifications.

6

[*P8]  At defense counsel's request, the trial court permitted the parties to file simultaneous post-hearing memoranda by April 8 on whether it would be appropriate for defense counsel call the witness who made the photospread identifications. Both parties filed memoranda on April 8, focusing primarily on whether the procedures were unduly suggestive. Defense counsel asked the court to suppress Castro's identification or, alternatively, to require Castro to give testimony at a later suppression hearing regarding the photospread process and her identification of Dewberry. The State asked the court to overrule the motion to suppress because the procedures were not unduly suggestive. The State indicated that, if the court were to find something unduly suggestive, then the State would request a hearing regarding the reliability of the identification, at which time the State would anticipate calling Castro to testify.

[*P9]  On April 18, 2016, the trial court overruled Dewberry's motions in their entirety, including Dewberry's request to call Castro as a suppression hearing witness.

* * *

[*P25]  Detective Geiger went to the hospital on the morning of the shooting and met with Castro in the Intensive Care Unit. Castro was unable to communicate orally, but she could communicate in writing. Castro stated that she was tired, scared, and in pain, but she did not identify her shooter.

[*P26]  By August 25, Detective DeBorde had identified Dewberry as a suspect and prepared a photographic lineup containing Dewberry's photo. Detective Geiger, who was not aware that Dewberry was a suspect, returned to the hospital and showed the photospread to Castro. Castro did not identify anyone as the shooter. Castro testified at trial that she knew that Dewberry was the shooter, but she "was scared that he was going to come and kill me, my kids, my family." (Tr. at 435.)

[*P27]  On September 5, Detective Daugherty and Detective Tom Cope spoke with Dewberry at Dewberry's apartment. At that time, Dewberry stated that he had spoken with Pierce every day since his (Dewberry's) son's death and that he (Dewberry) was home at his apartment the entire evening of Pierce's homicide; Dewberry confirmed his cell phone number.

7

[*P28]  After Castro was released from the hospital, she moved out of Dayton and decided to contact the police about the shooting. John Smith, an Air Force attorney, initially contacted Detective Daugherty for Castro. After Castro spoke directly with Daugherty by phone, she returned to Dayton and met with Detective Daugherty on September 25, 2015. Castro showed Daugherty a photograph from Facebook of the person who shot her; the photo was of Dewberry. Castro was shown another photographic lineup, which contained the same individuals as the prior lineup but in a different order. Castro identified Dewberry as the shooter and indicated that she was 100 percent certain of the identification. Castro testified at trial that she had met Dewberry for the first time on the night of the shooting, but she had previously seen photos of him and had seen him in person at a party when the Webster Station Bar closed in 2013.

[*P29]  Dewberry was arrested, taken to the police station for an interview, and subsequently taken to jail. While Detectives Daugherty and Cope walked Dewberry to the jail, Dewberry repeatedly asked them "what the girl was saying." The detectives did not respond. Dewberry then stated, "You'll never get that girl on the stand to testify against me." (Tr. at 657.)

* * *

## III. Motion to Suppress

[*P55]  In his first assignment of error, Dewberry claims that the trial court erred in denying his motion to suppress Castro's photospread identification. He argues that Castro's eyewitness identification from the second photospread should have been suppressed, because the photospread procedures failed to comply with the requirements of R.C. 2933.83. Dewberry further asserts that he should have been permitted to question Castro at the suppression hearing about her identification.

[*P56]  In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford,* 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley,* 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of

fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

[*P57] Four police officers testified at the hearings on the motions to suppress. At the beginning of the March 18, 2016 hearing, the trial court told Dewberry that "there are only certain limited circumstances under which the witness who make [sic] an identification (indiscernible) in that photospread comes to court for purposes of the motion. I make that determination. And it is not made yet, and unless I determine a certain way, the complaining witness will not be required to come here for the motion to suppress. * * *" (Supp. Tr. at 10-11.) The court later clarified that if it "felt that the witness who identified the defendant in the photospread needed to be brought in, that would be after [the March 29 hearing]." (Supp. Tr. at 44-45.)

[*P58] Detective Geiger testified that he was "peripherally involved" in the investigation of the shootings in that he spoke with Castro at the hospital on the day of the shooting and showed her a photospread lineup a couple of days later. Geiger stated that he saw Castro at approximately 9:30 a.m. on August 21; Castro had a tube in her throat and could not speak, but she could communicate by written notes and by moving her head (yes/no). Castro did not provide the name of a suspect at that time.

[*P59] During the course of the investigation, the police identified Dewberry as a suspect. Detective Michael DeBorde compiled a six-photo photospread using the Montgomery County Sheriff's Office's JusticeWeb system, which searched for photos similar to Dewberry's. DeBorde selected five photos (plus Dewberry's) from more than 100 possible similar photos. After completing the photospread, DeBorde looked at it and "noticed that every individual [was] fairly like and similar and it wasn't unduly suggestive. It was a good photograph in my mind." (Supp. Tr. at 114.) When the photospread printed, it included the six-person photospread, a key, and the instruction pages and forms. DeBorde testified that State's Exhibit 6 (renumbered as State's Exhibit 2 at trial) was the photospread he created and gave to Detective Geiger. DeBorde identified State's Exhibit 6A as the key for the photospread, providing names and identifiers for the individuals in the photospread; he stated that he did not give the key to Geiger.

[*P60]  On August 25, Geiger and DeBorde went to the hospital and spoke with Castro. DeBorde told Castro that he wanted her to look at some pictures. DeBorde stepped out of the room, and Geiger showed the photospread lineup to Castro. Geiger testified that he (Geiger) was a blind administrator, i.e., he did not know the identity of any potential suspects, and DeBorde testified that he did not tell Geiger the suspect's name. Geiger noted on the photospread form that Castro's sister was also in the room, but the sister could not see the photospread and did not interact at all. Geiger noted the location, date, and time on the form and read the instructions verbatim.

[*P61]  Geiger handed the photospread to Castro, who "looked at it for a few minutes" then "handed it back to [him] and shook her head no." Geiger asked Castro if she recognized anyone and she again shook her head no. When asked if he did anything to confirm or deny her failed identification, Geiger testified that he "could not" because he "didn't know the identities of the people in the lineup." Geiger stated that he was not provided the photospread key. Geiger did not complete section 8 of the form, which asked for identification/non-identification and confidence statements made by the witness; Geiger stated that he forgot to mark that she did not make an identification. Geiger also did not mark whether Castro had viewed the lineup more than once, but he testified that she did not. Geiger reported the non-identification to Detective DeBorde.

[*P62]  Detective Daugherty testified that, sometime after Castro had been shown the initial photospread, he received a telephone call from an attorney (a friend of Castro's sister) on Castro's behalf. The attorney told Daugherty that Castro knew who had shot her, but she was "scared to come forward because she's in fear of her life."

[*P63]  Later that afternoon, Castro called Daugherty directly. Castro would not identify her shooter over the phone, but she and the detective made arrangements to meet the following day at the downtown Dayton police station. When they met, Castro told Daugherty that Dewberry had tried to friend her cousin on Facebook, and she (Castro) showed Daugherty a Facebook photo of Dewberry. Castro indicated that the photo was of the shooter. (Daugherty testified that the conversation was audio and video-recorded, but no recording of this interview was offered as evidence at the suppression hearing.) Daugherty prepared a search warrant for the search of Dewberry's residence after Castro's identification.

[*P64]  After Dewberry's arrest and the execution of the search warrant, Detective DeBorde prepared a second photospread (State's Exhibit 7, renumbered at trial as State's Exhibit 3). He used the same photos as the first photospread, but they printed in a different order. Detective DeBorde met with Castro at the police department, and he asked Officer Kyle Watts to show the photospread to her. DeBorde retained the key for the photospread (State's Exhibit 7A).

[*P65]  Watts testified that he was asked by Detective DeBorde to show a photospread on September 25, 2015. Watts had not previously been involved in the investigation, and he was unfamiliar with Dewberry and Castro. Shortly before noon, Watts went into an interview room at the police department and introduced himself to Castro. Watts read Castro the photospread instructions verbatim, initialed that he had done so, and noted the date, time, and location. Watts also noted on the form that he was a blind administrator.

[*P66]  Watts then showed Castro the photospread and told her to circle a photo if she recognized anyone. Castro immediately circled photo number 6 (Dewberry's photo) and initialed below it. Castro wrote that the person "shot me and killed Jesse" and she indicated that she was 100 percent certain. After the identification, Castro and Watts signed and dated the bottom of page 4. Watts stated that he was not given the key for the photospread. Watts testified that he handed the packet to Detective DeBorde, who noticed that Castro had not signed the bottom of page 3 (the page with six photos). Watts immediately took the packet back to Castro, and she and Watts signed the page. Watts then returned the packet to Detective DeBorde.

[*P67]  Geiger and Watts were asked about the Dayton Police Department's photospread policy, which was admitted as State's Exhibit 5. (That exhibit was returned to the State and is not part of the record before us.) The officers testified that they believed that they complied with the policy.

[*P68]  At the conclusion of the hearing, the trial court allowed the parties to file simultaneous briefs on whether it would be appropriate for defense counsel to call Castro as a witness regarding the photospreads. The parties filed memoranda primarily on whether the photospreads were unduly suggestive; defense counsel did not argue that Dewberry had a due process right to call Castro or that her testimony was necessary to establish that the procedures were unduly suggestive.

11

[*P69]  The trial court subsequently ruled that the first photospread was conducted in compliance with R.C. 2933.83 and, even if had not, "any impropriety would not have been prejudicial as there was no identification made." With respect with the second photospread, from which Castro identified Dewberry, the court initially concluded that the Facebook photo did not result from police action and that the Facebook photo did not taint Castro's later identification of Dewberry. It further concluded that there was "no evidence to suggest that the photo line-up shown to Castro by Watts on September 25, 2015 was not properly conducted or was unduly suggestive." The court also concluded that, because Dewberry did not meet his burden of proving that the pretrial identification by Castro was unduly suggestive, Castro was not required to provide pretrial testimony regarding the identification.

* * *

[*P79]  Dewberry further argues that the trial court erred in precluding him from calling Castro to testify at the suppression hearing. In its ruling, the trial court concluded that Castro was not required to testify, because Dewberry did not establish that the pretrial identification was unduly suggestive.

[*P80]  In *State v. Rivera,* 2d Dist. Montgomery No. 18845, 2002-Ohio-283, 2002 WL 91296 (2002), we rejected the notion that an eyewitness's testimony is relevant only to the issue of the reliability of an identification. We held that the trial court "abused its discretion when it denied [Rivera's] request to call two eyewitnesses to testify at the suppression hearing in which he was contending that an unduly suggestive photographic identification procedure was used." 2002-Ohio-283, Id. at *1. We noted that the eyewitnesses "would have been the best witnesses on that issue, and they would not have shared the bias of the police officer who testified at the suppression hearing, who presumably would have been interested in avoiding a finding that his police work was flawed." Id.; see also *State v. Hand,* 2d Dist. Montgomery No. 22114, 2008-Ohio-1870, ¶ 20, fn. 1 (commenting that the trial judge appeared to have the "misimpression" that eyewitness testimony at the suppression hearing would only be relevant to the issue of reliability).

[*P81]  The Eighth District held similarly in *State v. Glover*, 8th Dist. Cuyahoga No. 84413, 2005-Ohio-1984. In holding that the trial court erred in precluding defense counsel from calling three

witnesses to whom a photospread had been shown (and who were present to testify at the suppression hearing), the appellate court reasoned:

> Here, the trial judge apparently believed that the only issue relevant to the out-of-court identification was whether the photographs contained in the photo array were impermissibly suggestive. However, the issues presented by appellant in the hearing on his motion to suppress were not just the assemblage of the photo array, but also the procedure employed in presenting the array to the victims.
>
> * * *
>
> By refusing to hear testimony from anyone other than the police officers, the trial court denied appellant the opportunity to present testimony that may have conflicted with that of the police officers regarding the procedures employed in presenting the photo array to the victims. In effect, the trial court adopted the premise that a police officer's testimony must be accepted as true. An officer's testimony is obviously subject to the same tests questions of accuracy and veracity, however, as any other witness' [sic] testimony.
>
> Moreover, the defendant bears the burden of proving that the out-of-court identification was flawed. Here, by refusing to hear testimony from the witnesses to whom the array had been shown, the trial court denied appellant a valid opportunity to meet his burden and to confront the witnesses. Contrary to the State's argument that only the State determines who to present as witnesses at a hearing regarding a motion to suppress an out-of-court identification, the defendant clearly has the right to call witnesses to testify at such a hearing.
>
> By denying appellant's request to present testimony from the witnesses to whom the photo array had been shown, the trial court denied appellant a full and fair hearing regarding the photo array and identification procedures. Accordingly, appellant's conviction is reversed and the matter is remanded for a new trial.

(Emphasis sic.) (Citation omitted.) *Glover* at ¶ 18, ¶ 20-22.

13

[*P82]  As with *Rivera* and *Glover*, we find that there was no reasonable basis to preclude Dewberry from calling Castro to testify at the suppression hearing. Although the Dayton police officers' testimony indicated that their identification procedures for both photospread lineups were not unduly suggestive, Castro arguably could have contradicted the officers' testimony. Castro was in the best position to testify whether an officer emphasized a particular photo to select or otherwise influenced her identification (or lack thereof), or that she perceived the officer's conduct in that manner. Moreover, as stated in Glover, the trial court denied defense counsel the opportunity to determine how best to meet Dewberry's burden to establish that the identification procedures were unduly suggestive.

[*P83]  In *Rivera*, we nevertheless concluded the trial court's error was harmless in light of the witnesses' testimony at trial, during which they were extensively examined concerning the eyewitness identification procedure, and that their testimony would not have been helpful to the defendant in establishing that the procedure was unduly suggestive. Id. In this case, however, Castro's trial testimony regarding the three identification opportunities focused on her reasons for twice failing to make an identification at the hospital. While Castro provided some testimony that officers presented two photospreads to her -- once while she was hospitalized and again after she moved from the Dayton area -- her testimony did not detail the identification procedures used by the officers. Thus, unlike Rivera, Castro's trial testimony did not reflect how she might have testified about the photospread identification procedures had she been called to testify at the suppression hearing.

[*P84]  Regardless, under the unique facts of this case, we find that the trial court's denial of Dewberry's request to call Castro as a suppression hearing witness was similarly harmless. Specifically, Castro's trial testimony indicates that, even if the second photospread identification procedures were unduly suggestive, her identification of Dewberry was reliable nonetheless.

[*P85]  Under certain circumstances, an eyewitness's identification may be found sufficiently reliable, despite the use of unduly suggestive identification procedures by law enforcement. See, e.g., *State v. Henderson*, 2d Dist. Montgomery No. 28241, 2020-Ohio-6 (victim's identification of defendant was sufficiently reliable despite the suggestiveness inherent in a one-person show-up identification procedure); *State v. Gabriel*, 2d Dist. Montgomery No. 24144,

14

2011-Ohio-4664 (photospread identification was sufficiently reliable due to victims' acquaintance with defendant). For example, in Gabriel, we held that, even if the defendant's photo in a six-person photospread were unduly suggestive, the two victims' immediate identification of the defendant from the photospread was sufficiently reliable where the victims previously told detectives that they knew one of the perpetrators by his nickname, informed the detectives of where the perpetrator went to school, and stated that they knew the perpetrator from a prior encounter. See also *State v. Henderson*, 6th Dist. Lucas No. L-10-1122, 2012-Ohio-1396; *State v. Huff*, 145 Ohio App.3d 555, 763 N.E.2d 695 (1st Dist.2001) (even assuming the identification procedure was unduly suggestive, the identification was nonetheless reliable based upon the witness's prior familiarity with Huff); *State v. Barnett*, 67 Ohio App.3d 760, 768, 588 N.E.2d 887 (4th Dist.1990).

[*P86] Similarly, in this case, the evidence at trial indicated that Castro was familiar with Dewberry prior to the shooting and that her identification of him from the second photospread was sufficiently reliable due to that familiarity. Castro testified at trial that she met Pierce approximately a year before the shooting and that Pierce referred to Dewberry's son, known as G-Man, as his brother. Castro was friends on Facebook with G-Man and Pierce. After G-Man was killed on August 14, 2015, there was "a lot of Facebook traffic" about G-Man, which included the posting of several photographs of GMan and his family. Castro testified that she saw "plenty" of photographs of G-Man's father (i.e., Dewberry) and that she had seen G-Man's father "just around town." Castro did not know G-Man's or his father's first and last names; she knew G-Man's father by his nickname, Bustdown, and she knew that Pierce called him "Pops."

[*P87] At trial, Castro also recalled seeing G-Man's father several years before at the Webster Station Bar when it had a closing-down party. On cross-examination, Castro indicated that she was dating someone else at that time and did not know then who Dewberry or his sons were. Castro explained that her then-boyfriend knew Dewberry and was speaking with Dewberry at the bar, and that the boyfriend told Castro who he was. Although Dewberry presented evidence that he was in prison when the Webster Station bar closed, Castro's testimony indicated that she became more familiar with G-Man's father after she began dating Pierce, G-Man's best friend.

15

[*P88]  Castro testified at trial that, on the night she and Pierce were shot, Pierce told her that he needed to meet Bustdown after getting food at the restaurant; Castro testified that Pierce kept calling Bustdown just prior to the shooting. Castro stated that after getting their food, Pierce drove the car around the corner, and Castro saw Bustdown standing on the corner. Bustdown got into the rear passenger area of the car, and Pierce introduced her to Bustdown. Immediately afterward, Pierce and Castro were shot. Castro testified that she knew who had shot her and Pierce, but she did not tell the police immediately out of fear for her and her family's safety.

[*P89]  When asked when she learned the first and last names of Bustdown, Castro testified:

> A: I knew his name the same day that I was in -- when I first went to the hospital. Once I got to the hospital I had my sister bring my other cell phone that I was currently letting my daughter use and I got on Facebook and I went right to the page.
>
> Q: What page did you go to?
>
> A: George Dewberry, Sr. He was friends with Jesse [Pierce] on there.

[*P90]  Castro testified that, after being released from the hospital and leaving the Dayton area, she was willing to identify her shooter. When she returned to Dayton, she showed Detective Daugherty a Facebook "friend request" from Dewberry, which had his name and photograph. Castro stated that she had seen the person in the Facebook photo previously — in Facebook photos, in person, and on the night of the shooting as the person who got into the car behind her. Following Castro's identification of Dewberry as the shooter, the police presented her with the second photospread from which she identified Dewberry.

[*P91]  Although there was some evidence at trial that Dewberry was not actually at the Webster Station bar's closing party, Castro's testimony indicated that Dewberry was not a stranger to her and that she knew who he was, even if she had not spoken with him personally, prior to the shooting. Even assuming that Castro were to testify that police procedures during the presentation of the second photospread were unduly suggestive, the record reflects that Castro's identification of Dewberry as the shooter was sufficiently reliable to

warrant its admission at trial. Accordingly, the trial court did not commit reversible error in denying Dewberry's motion to suppress Castro's pretrial identification.

[*P92] Dewberry's first assignment of error is overruled.

*Dewberry I.*

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000). Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Dewberry argued his First Assignment of Error both in terms of failure of the Dayton Police to comply with Ohio Revised Code § 2933.83, the statute prescribing procedures for photo identification, and in terms of denial of Dewberry's right to present Castro as a witness (Appellant's Brief, State Court Record, ECF No. 8, Ex. 18). While the Brief does not cite the Sixth Amendment or any federal case law, the claim of refusal to permit a defense witness clearly called to the appellate court's attention the constitutional right to present witnesses, a claim the court decided on the merits. Respondent does not assert the constitution al claim was not fairly presented.

The Second District decided the compulsory process claim on the merits in Dewberry's favor, but held the error was harmless because Castro's trial testimony showed her identification

of Dewberry was reliable. *Dewberry I* at ¶ 84. Petitioner admits that compulsory process claims are subject to harmless error analysis. (Traverse, ECF No. 13, PageID 1430). He argues

> Here, as explained above, Ms. Castro would have testified to her identification of Mr. Dewberry and the identification procedures as that was the subject of the hearing. Since Ms. Castro would have been under oath and testified truthfully, her testimony would have revealed significant discrepancies in the photo array administration procedure which amounted to impermissible suggestiveness.

*Id.* This claim is completely speculative. Dewberry points to no aspect of the identification procedure which Castro would have described differently from the officers who conducted the procedure. Castro did indeed testify at trial and was subject to cross-examination on all aspects of her identification of Dewberry, including that she had failed to identify him until she left Dayton in fear for her safety and that of her children. Before a refusal to call a witness at a defendant's instance can be found to have caused harm, the defendant must show that the excluded testimony would have been material and favorable. Petitioner admits this point in his Traverse (ECF No. 13, PageID 1428, citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982)). Castro's description of the identification procedure would surely have been material, but there is no evidentiary basis from which to infer it would have been favorable to Dewberry.

Constitutional error in a habeas case is not required to be harmless beyond a reasonable doubt as is required on direct appeal by *Chapman v. California*, 386 U.S. 18 (1967). Rather, constitutional error is harmless if the habeas court is satisfied it did not have a substantial and injurious effect or influence in determining the verdict. *Brecht v. Abrahamson*, 507 U.S. 619 (1993), adopting standard from *Kotteakos v. United States*, 328 U.S. 750 (1946). A federal court may grant habeas relief only if a constitutional violation had a substantial and injurious effect or influence in determining the jury's verdict. *Williams v. Bauman*, 759 F.3d 630, 637 (6th Cir.2014).

18

This standard calls for reversal when the reviewing court lacks a "fair assurance" that the outcome of a trial was not affected by evidentiary error. *Beck v. Haik*, 377 F.3d 624 (6th Cir. 2004).

The Magistrate Judge is satisfied that refusal to call Ms. Castro as a witness at the motion to suppress hearing was harmless in that there is no showing she would have described the identification procedure any differently than the administering officers. Further, at trial, she was subject under the Confrontation Clause to plenary cross-examination about her identification. Therefore the Second District's decision on the compulsory process portion of the First Assignment of Error is not an unreasonable application of the relevant Supreme Court precedent and is entitled to deference on the merits.

In the alternative Respondent claims this compulsory process claim is procedurally defaulted because it was not presented to the Second District as a constitutional claim (Return of Writ, ECF No. 9, PageID 1413). The Magistrate Judge disagrees. Although there is no discussion either in Appellant's Brief or the Second District's decision of Supreme Court precedent on the right to compulsory process, the Second District clearly understood Dewberry was claiming he had a right to have Castro testify.

A federal constitutional claim is fairly presented to the state courts if the petitioner

> (1) relied upon federal cases employing constitutional analysis; (2) relied upon state cases employing federal constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law.

*Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017). Dewberry's First Assignment of Error on appeal fits within the parameters of *Hand*.

A state court decision can constitute an "adjudication on the merits" entitled to deference

under 28 U. S.C. § 2254(d)(1) even if the state court does not explicitly refer to the federal claim

or to relevant federal case law. In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court

held:

> By its terms § 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2). There is no text in the statute requiring a statement of reasons. The statute refers only to a "decision," which resulted from an "adjudication." As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning. *See Chadwick v. Janecka*, 312 F.3d 597, 605-606 (CA3 2002); *Wright v. Secretary for Dept. of Corrections*, 278 F.3d 1245, 1253-1254 (CA11 2002); *Sellan v. Kuhlman*, 261 F.3d 303, 311-312 (CA2 2001); *Bell v. Jarvis*, 236 F.3d 149, 158-162 (CA4 2000) (en banc); *Harris v. Stovall,* 212 F.3d 940, 943, n. 1 (CA6 2000); *Aycox v. Lytle,* 196 F.3d 1174, 1177-1178 (CA10 1999); *James v. Bowersox*, 187 F.3d 866, 869 (CA8 1999). And as this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d). *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam). Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim," not a component of one, has been adjudicated.

*Id.* at 98. "This Court now holds and reconfirms that § 2254(d) does not require a state court to

give reasons before its decisions can be deemed to have been 'adjudicated on the merits.'" *Id.* at

100. "When a federal claim has been presented to a state court and the state court has denied relief,

it may be presumed that the state court adjudicated the claim on the merits in the absence of any

indication or state-law procedural principles to the contrary.*" Brown v. Bobby*, 656 F.3d 325, 329

(6th Cir. 2011), *quoting Harrington,*131 S. Ct. at 784-85. Dewberry's First Ground for Relief

should be denied on the merits and not because it was procedurally defaulted.

**Ground Two: Use of an Unnecessarily Suggestive Identification Procedure**

In his Second Ground for Relief, Petitioner claims he is entitled to habeas relief because an unduly suggestive identification procedure was used to identify him. Dewberry presented his claim that the second photo array shown to Castro was unduly suggestive to the Second District Court of Appeals which decided it as follows:

> [*P69] The trial court subsequently ruled that the first photospread was conducted in compliance with R.C. 2933.83 and, even if had not, "any impropriety would not have been prejudicial as there was no identification made." With respect with the second photospread, from which Castro identified Dewberry, the court initially concluded that the Facebook photo did not result from police action and that the Facebook photo did not taint Castro's later identification of Dewberry. It further concluded that there was "no evidence to suggest that the photo line-up shown to Castro by Watts on September 25, 2015 was not properly conducted or was unduly suggestive." The court also concluded that, because Dewberry did not meet his burden of proving that the pretrial identification by Castro was unduly suggestive, Castro was not required to provide pretrial testimony regarding the identification.
>
> [*P70] First, Dewberry challenges the denial of his motion to suppress the identification from the second photospread. He states that he is not challenging the first photospread, as Castro did not identify him.
>
> [*P71] "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
>
> [*P72] The defendant must first show that the identification procedure was unduly suggestive. "A lineup is unduly suggestive if

it steers the witness to one suspect, independent of the witness's honest recollection." (Citations omitted.) *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208. If the pretrial identification procedure was not unfairly suggestive, any remaining questions as to the identification's reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id*. at ¶ 209; *State v. Williams*, 2d Dist. Montgomery No. 26357, 2015-Ohio-1403, ¶ 13.

[*P73] If, on the other hand, the defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, was reliable despite the suggestive procedure. E.g., *Williams* at ¶ 13. In reviewing the likelihood that the circumstances resulted in a misidentification, courts have considered the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil* at 199-200; *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Bates*, 110 Ohio St.3d 1230, 2006-Ohio-3667, 850 N.E.2d 1208, ¶ 8.

[*P74] Reliability of the pretrial identification is the linchpin in determining its admissibility. *Manson* at 114. "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002-Ohio-939, 2002 WL 254144, *3 (2002).

[*P75] We review a trial court's denial of a motion to suppress a pretrial identification for an abuse of discretion. *State v. Wilson,* 2d Dist. Montgomery No. 22624, 2009-Ohio-1038, ¶ 19.

[*P76] With the record before us, we find no error in the trial court's conclusion regarding the identification procedures employed by the Dayton police during the second photospread lineup. Upon review of the photospread, the photographs presented to Castro were not unduly suggestive. Detective DeBorde used JusticeWeb, which identified numerous photographs using characteristics similar to Dewberry; the photographs selected by Detective DeBorde closely resembled Dewberry. The same six photographs were presented to Castro in both the first and second photospreads (albeit in a different order), minimizing the risk that Dewberry's photo would be selected

over the other five due to its prior presentation. A different blind administrator presented each photospread to Castro, and there was nothing in the manner in which Officer Watts administered the second photospread that made its presentation unduly suggestive.

[*P77]  Dewberry claims that the second photospread should have been suppressed, because Watts violated R.C. 2933.83(B) by failing to have Castro immediately sign the bottom of page three of the photospread packet. R.C. 2933.83, which was enacted in 2010, provides minimum requirements for live lineup and photo lineup procedures. Those procedures include that the administrator of the lineup "shall make a written record that includes * * * [a]ll identification and nonidentification results obtained during the lineup, signed by the eyewitnesses, including the eyewitnesses' confidence statements made immediately at the time of the identification." R.C. 2933.83(B)(4)(a).

[*P78]  We have noted that, "even if a violation of R.C. 2933.83 occurs, violations of that statute are not independent grounds for suppression." E.g., *State v. McShann,* 2d Dist. Montgomery No. 27803, 2019-Ohio-4481, ¶ 40; *State v. Harmon,* 2017-Ohio-8106, 98 N.E.3d 1238, ¶ 23 (2d Dist.). Rather, we focus on whether "the procedure used in administering the photospread in this case, while not in compliance with R.C. 2933.83, was 'not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.'" *Harmon* at ¶ 31, quoting *State v. Moon,* 2d Dist. Montgomery No. 25061, 2013-Ohio-395, ¶ 35. Even assuming that Watts technically violated R.C. 2933.83 when he and Castro initially failed to sign page 3 of the photospread packet, that error was immediately remedied, and we find, on this record, that the procedure employed was not impermissibly suggestive as to give rise to a substantial likelihood of misidentification.

*Dewberry I.*

Dewberry claims the second photo array identification was "impermissibly suggestive as standard administrative practices were not adhered to by law enforcement during Ms. Castro's second attempt." (Traverse, ECF No. 13, PageID 1432-33).  Dewberry then expands this claim to include an allegation that Castro's identification was sufficiently unreliable that it should have been excluded.  Ground Two thus raises two issues:  was the second photo array impermissibly

23

suggestive and, even if it was, was Castro's identification nonetheless reliable?

The Supreme Court held in *Neil v. Biggers*, 409 U.S. 188 (1972):

> [T]he factors to be considered in evaluating the likelihood of
> misidentification include the opportunity of the witness to view the
> criminal at the time of the crime, the witness' degree of attention, the
> accuracy of the witness' prior description of the criminal, the level
> of certainty demonstrated by the witness at the confrontation, and
> the length of time between the crime and the confrontation.409 U.S.
> at 199; *accord, Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

An identification procedure violates a defendant's right to due process if it "was so unnecessarily suggestive as to run the risk of irreparable mistaken identification." *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005). Even if an identification procedure was impermissibly suggestive, the identification is still admissible if it is reliable. *Id.* at 469, 472. For a pre-trial identification procedure to be "'impermissibly suggestive,' the procedure must 'give rise to a very substantial likelihood of irreparable misidentification.'" *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018), *quoting Neil v. Biggers,* 409 U.S. 188, 197 (1972)).

The Second District Court of Appeals made a finding of fact that the second photo array was not impermissibly suggestive. That finding is binding on this Court in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e). The only two suggestions in the record are (1) that the second photo array was different from the first in that the same photographs were presented in a different order and (2) the method of administration varied from that prescribed in Ohio Revised Code § 2933.83 in that there was a very slight time gap between when the presentation was completed and when it was authenticated by signature. Neither of these is material.

Petitioner has not even suggested a way in which the order of the photographs appeared in the array could have been suggestive. He conceded that the first photo array was not suggestive[1]

---

[1] "Detective Michael DeBorde compiled a six-photo photospread using the Montgomery County Sheriff's Office's JusticeWeb system, which searched for photos similar to Dewberry's. DeBorde selected five photos (plus Dewberry's) from more than 100 possible similar photos." *Dewberry I* at ¶ 59.

and has made no argument as to how changing the order would have made the array suggestive.

Dewberry argues that the variance from the procedure prescribed by Ohio Revised Code § 2933.83 somehow made the array suggestive without suggesting how that could be so. The statute was evidently adopted to cure recognized problems with photo identification, but its procedures are not constitutionally mandated. Violation of a state statute regulating procedure in criminal cases does not rise per se to a due process violation. "A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable." *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir. 1993). And even apart from the force of law, Dewberry has not argued any way in which the slight delay in authentication could have rendered the identification impermissibly suggestive.

In sum, the Second District decision on suggestibility is a reasonable application of Supreme Court precedent and is entitled to deference.

The Second District also decided that Castro's identification was reliable, applying the relevant Supreme Court precedent. *Dewberry I* at ¶¶ 84-91, applying *Neil v. Biggers, supra,* and *Manson v. Brathwaite, supra.*

> In his Traverse, Dewberry argues against reliability as follows:
>
> In the instant case, Ms. Castro had been shown the same photo array a month prior, law enforcement merely changed the order. (Vol. 1, 3, 4, Tr. 34, 35, 120, 130, 440, 649, 650, ECF No. 8-1, 8-3, 8-4 , Page ID 429, 430, 515, 525, 835, 1044, 1045). During the first array, she failed to identify Mr. Dewberry. (Vol. 1, 3, Tr. 60-63, 67, 71, 74, 75, 88, 375, 378, 473, ECF No. 8-1, 8-3, Page ID 455-458, 462, 466, 469, 470, 483, 770, 773, 868). After a significant amount of time had passed, Ms. Castro declared with one hundred percent certainty that she identified the correct individual. (Vol. 1, 3, Tr. 88, 90, 91, 93, 107, 440, ECF No. 8-1, 8-3, Page ID 483, 485, 486, 488, 502, 835). However, her identification was tainted by the amount of time that passed as she had time to research and discuss those

26

featured in the first array and use that information in the second array. This is particularly relevant since the individuals included in the second array are the same as the first. In fact, Ms. Castro did use the information gained from her exposure to the first array as she then provided law enforcement with a photo from Facebook. (Vol. 1, 3, Tr. 34, 35, 48, 49, 56, 439, ECF No. 8-1, 8-3, Page ID 429, 430, 443, 444, 451, 834). Significantly, it was right after Ms. Castro provided this Facebook photo that the second array was administered. The sequence of events is concerning given the undeniable influence of outside forces. Ms. Castro's failure to identify her shooter during her first two interactions with law enforcement calls into question the level of certainty and validity of any subsequent meetings or potential identifications. Ms. Castro had failed to identify her shooter on two separate occasions yet, a month later, after she obtained a Facebook photo of Mr. Dewberry can now identify her shooter with the utmost confidence.

Ms. Castro expressed during her trial testimony that she was scared the first two opportunities she had to identify her shooter. (Vol. 3, Tr. 435, 441, 465-467, 473, ECF No. 8-3, Page ID 830, 836, 860-862, 868). If that is true and Ms. Castro knew the identity of the shooter the entire time, it was then unnecessary for her to provide a Facebook photo of Mr. Dewberry. Ms. Castro even testified that she knew the name after she got to the hospital. (Vol. 3, Tr. 459, ECF No. 8-3, Page ID 854). Therefore, there was no reason to have a Facebook picture. It seems more likely that Ms. Castro, after viewing the first array, familiarized herself with the faces, and found Mr. Dewberry's photo via Facebook. Since the array was the same, Mr. Dewberry's picture was the most recognizable. The Facebook photo of Mr. Dewberry necessarily tainted any subsequent photo array identification.

(ECF No. 13, PageID 1434-35). There is no evidence that Ms. Castro consulted with other people and particularly with the police before she obtained and then presented the Facebook picture of Dewberry to the police. Her testimony that she was afraid of someone who had shot her at point blank range is certainly credible and would explain her failure to identify Dewberry until she had moved out of Dayton. In any event, it cannot be said that the Second District's finding of reliability is an unreasonable determination of the facts based on the evidence presented. It is therefore entitled to deference under 28 U.S.C. § 2254(d)(2).

**Conclusion**


Based on the foregoing analysis, the Magistrate Judge respectfully recommends that the

Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this

conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that

the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not

be permitted to proceed *in forma pauperis*.


December 28, 2021.

s/ *Michael R. Merz*
United States Magistrate Judge



**NOTICE REGARDING OBJECTIONS**


Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the
proposed findings and recommendations within fourteen days after being served with this Report
and Recommendations. Such objections shall specify the portions of the Report objected to and
shall be accompanied by a memorandum of law in support of the objections. A party may respond
to another party's objections within fourteen days after being served with a copy thereof.  Failure
to make objections in accordance with this procedure may forfeit rights on appeal. #